NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11865
SJC-11866

ROBERT MacLAURIN[1] & another[2] <u>vs</u>.  CITY OF HOLYOKE & others.[3]

ROBERT MacLAURIN[4] & another[5] <u>vs</u>.  CITY OF HOLYOKE & others.[6]


Hampden.      September 10, 2015. - August 18, 2016.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk, &
Hines, JJ.[7]


<u>Fire Prevention</u>.  <u>Practice, Civil</u>, Action in nature of
certiorari.  <u>Administrative Law</u>, Hearing.


_____

[1] Individually and as president of Sylvan, Inc., trustee of
the 215 Chestnut Street Realty Nominee Trust.

[2] 215 Chestnut Street Realty Nominee Trust.

[3] Holyoke Fire Department and Chief of Holyoke Fire
Department.

[4] Individually and as president of Sylvan, Inc., trustee of
the 11 Spring Street Realty Nominee Trust.

[5] 11 Spring Street Realty Nominee Trust.

[6] Holyoke Fire Department and Chief of Holyoke Fire
Department.

[7] Justices Spina, Cordy, and Duffly participated in the
deliberation on this case prior to their retirements.

Civil actions commenced in the Hampden Division of the Superior Court Department on April 26, 2012, and May 14, 2012, respectively.

After transfer to the Western Division of the Housing Court Department and consolidation, the case was heard by Robert Fields, J., on a motion for judgment on the pleadings.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

Thomas D. Moore for the plaintiffs.
Kara Lamb Cunha for the defendants.
The following submitted briefs for amici curiae:
Jason R. Ferenc for Greater Holyoke Rental Housing Association
Joseph N. Schneiderman for Fire Chiefs Association of Massachusetts.
Maura Healey, Attorney General, Benjamin K. Golden, Assistant Attorney General, Steven P. Rourke, Special Assistant Attorney General, & Peter Senopoulos for the State Fire Marshal.

LENK, J.  We are called upon in these consolidated cases to construe G. L. c. 148, § 26I, the residential sprinkler provision, one of a number of provisions requiring the installation of automatic sprinkler systems contained in G. L. c. 148, the fire prevention act.  The residential sprinkler provision mandates the installation of automatic sprinklers in new residential buildings of four or more units, and in such existing buildings when they are "substantially rehabilitated so as to constitute the equivalent of new construction."  See G. L. c. 148, § 26I.

In 2006, the plaintiff, Robert MacLaurin,[8] purchased the second of two vacant apartment buildings in the city of Holyoke (city), which he intended to rehabilitate and return to occupancy.  As existing residential buildings of four or more units, the buildings were subject to the residential sprinkler provision.  MacLaurin contends that the renovations he undertook on the buildings do not meet the statutory standard triggering the requirement that sprinklers be installed.  Concluding, to the contrary, that the two buildings had been substantially rehabilitated within the meaning of the residential sprinkler provision, the city's fire chief ordered, without a hearing, that automatic sprinkler systems be installed in each building.

The residential sprinkler provision differs from all of the other automatic sprinkler provisions in the fire prevention act[9] in that it contains no statutory right of appeal.  After several agencies had declined jurisdiction, MacLaurin filed complaints seeking relief in the nature of certiorari and declaratory

---

[8] For convenience, we refer to Robert MacLaurin, both in his personal capacity and as trustee of both the 215 Chestnut Street Realty Nominee Trust and the 11 Spring Street Realty Nominee Trust, as well as the 215 Chestnut Street Realty Nominee Trust and the 11 Spring Street Realty Nominee Trust themselves, as a single entity.

[9] See, e.g., G. L. c. 148, § 26A ("high rise buildings" of more than seventy feet in height); G. L. c. 148, § 26G (commercial buildings of more than 7,500 square feet); G. L. c. 148, § 26G 1/2 ("[n]ightclubs, dance halls, discotheques, [and] bars" having capacity of at least one hundred); G. L. c. 148, § 26H ("[l]odging or boarding houses").

judgment, challenging the orders as arbitrary and capricious. Following a remand of the consolidated matters for reconsideration in light of additional facts, which the fire chief concluded had no effect on his decision, a judge of the Housing Court affirmed the chief's orders, and this appeal followed.

The statutory standard that installation of automatic sprinklers is necessary only where an existing multi-unit residential building has been "substantially rehabilitated so as to constitute the equivalent of new construction" is not defined in the residential sprinkler provision or anywhere else in the fire prevention act, and the language does not appear in any other section of the fire prevention act. Moreover, there is no controlling appellate jurisprudence and no applicable Statewide guidance akin to that which has been developed by entities such as the automatic sprinkler appeals board, in considering appeals from the requirement to install sprinklers under other statutory provisions, all of which do include a statutory right of appeal.

In construing the meaning of the statutory standard that installation of automatic sprinklers in existing residential buildings is required only when a building has been "substantially rehabilitated so as to constitute the equivalent of new construction," we therefore turn to fundamental principles of statutory interpretation. See, e.g., Boston

Police Patrolmen's Ass'n v. Boston, 435 Mass. 718, 719-720 (2002).  In doing so, we consider the ordinary meaning of the words the Legislature used, in conjunction with their specialized meaning in certain contexts, the course of the enactment of the automatic sprinkler provisions within the fire prevention act, as well as the goals the Legislature intended to achieve.  We conclude that, in order to require the installation of sprinklers in an existing multi-unit residential building, the rehabilitation must be so substantial that the physical structure is rendered "the equivalent of new construction," i.e., in essence as good as new.[10]  Where the rehabilitation is suitably substantial in this regard, a corollary is that the cost of installation of automatic sprinklers ordinarily will approximate the cost of installing sprinklers in a comparable newly constructed building.

Although the fire chief's decision states that, after the modifications were complete, the buildings had been "substantially rehabilitated so as to constitute the equivalent of new construction," the decision neither contains any explicit findings of fact nor sets forth the test used to evaluate the nature of the work done.  Given this, coupled with the absence

---

[10] See, e.g., L. Rosenthal & D. Listokin, New or Rehab: Striking a New Balance Under California's Affordable Housing Standards, University of California at Berkeley, Program on Housing and Urban Policy, Working Paper No. W09-002 (Mar. 2009).

of controlling authority, the Housing Court judge was not in a position to ascertain whether the fire chief's interpretation of G. L. c. 148, § 26I, reasonably reflects the intent and purpose of the residential sprinkler provision, nor could the judge have ascertained whether the application of that interpretation is supported by the facts of record. Accordingly, no determination properly could be reached as to whether the decision was legally erroneous or so devoid of factual support as to be arbitrary and capricious. See State Bd. of Retirement v. Woodward, 446 Mass. 698, 703-704 (2006). Thus, the judgment affirming the fire chief's decision must be vacated and, with the guidance we now provide as to the meaning of "substantially rehabilitated so as to constitute the equivalent of new construction," the matter remanded to the chief of the city fire department for further proceedings consistent with this opinion.[11]

Background and prior proceedings.[12] The two vacant apartment buildings at issue here were built in the late 1800s,

---

[11] We acknowledge the amicus briefs submitted by the State Fire Marshal, the Fire Chiefs Association of Massachusetts, and the Greater Holyoke Rental Housing Association.

[12] The facts are taken from apparently undisputed facts in the parties' briefs, documents in the record, and statements in the orders and decisions of the fire chief and the Housing Court. The fire chief's decision does not include express findings of fact, and because the matters were considered in the Housing Court on petitions for certiorari, the Housing Court judge also made no findings of fact.

of wood frame construction with brick facade. One, a three-story building on the corner of Essex and Chestnut Streets, has a total of twenty apartments on three floors and two commercial spaces on the ground floor; the other, a four-story building on the corner of Main and Spring Streets, has a total of thirteen apartments on four floors and two commercial spaces on the ground floor.[13] Each has sustained fire damage in the past, including while empty. MacLaurin purchased both buildings, which had been boarded and abandoned, with the intent to rehabilitate them and return them to occupancy. He obtained building permits, hired contractors, and undertook the proposed work;[14] each portion of the work, such as electrical and plumbing modifications, was approved by the relevant city inspectors as it was completed.

The city adopted G. L. c. 148, § 26I, a "local option"

---

[13] The residential sprinkler provision is applicable to buildings "occupied in whole or in part for residential purposes." See G. L. c. 148, § 26I.

[14] MacLaurin acquired the Essex Street property in July, 2004, and applied for a building permit to "restore and repair building including walls, floors and ceilings: patch and replace plaster as needed, and repaint; also reconstruct rear porches" in November, 2008. The building permit issued in May, 2009.

MacLaurin acquired the Main Street property in June, 2006, and applied for a building permit in June, 2007. A building permit issued in September, 2007, to "restore and repair building including walls, floors and ceilings: patch and replace plaster as needed, and repair; also reconstruct rear porches."

statute, in February, 1996.[15] On its face, the city's general application form for a building permit requires that a plan for an automatic sprinkler system be submitted with the application, and it is undisputed that sprinkler plans,[16] and modifications to one set of plans, were attached to MacLaurin's permit applications.[17] During the course of the several-year period in which the work was being done, MacLaurin submitted to the building inspector several reports from licensed structural engineers stating that the work was not structural, that the buildings were not being "substantially rehabilitated" within the meaning of G. L. c. 148, § 26I, and thus that the requirement for installation of automatic sprinklers had not been triggered. When the work was essentially complete,

---

[15] A local option statute is applicable only where a municipality chooses to adopt its provisions. See, e.g., Adams v. Boston, 461 Mass. 602, 609 (2012), and cases cited; Connors v. Boston, 430 Mass 31, 37 (1999); 1010 Memorial Dr. Tenants Corp. v. Fire Chief of Cambridge, 424 Mass. 661, 668 n.4 (1997). With the exception of high rise buildings, see G. L. c. 148, § 26A, the sprinkler provisions in the fire prevention act were all initially adopted as local option provisions.

[16] The plans were apparently "sprinkler narrative letters," describing a proposed system in general terms and specifying the types of components that would be used; they were not diagrams of the floor plans showing where particular components would be installed, nor were cost estimates provided in connection with the plans.

[17] The parties dispute whether the submission of such plans was a prerequisite for the issuance of building permits, and whether the fire chief made statements to that effect to MacLaurin.

MacLaurin sought inspection by the city in order to determine what else remained to be done so that certificates of occupancy could issue. In February, 2012, the city's building commissioner, the assistant building commissioner, and a fire department captain made onsite inspections of each building. The fire chief then issued orders requiring automatic sprinkler systems be installed in each building.

MacLaurin sought review of the fire chief's orders before the State fire marshal, the State building code appeals board, and the automatic sprinkler appeals board; each declined to hear his appeals, citing a lack of jurisdiction.[18] MacLaurin then filed complaints seeking relief in the nature of certiorari, G. L. c. 249, § 4, and declaratory judgment, in the Superior Court. The cases were transferred to the Housing Court on joint motions of the parties, and then were consolidated. MacLaurin claimed, among other things, that the fire chief's 2012 orders contained significant factual errors, particularly concerning the scope and nature of the work, such as whether substantial portions of walls and ceilings had been opened so as to have facilitated sprinkler installation. In light of documents

---

[18] Although the statute provides no route of appeal for owners of multi-unit residential buildings if the buildings are less than seventy feet tall, guidance issued by the State board of building regulations and standards states, without apparent basis, that such an owner aggrieved by a decision of a municipality's fire official may appeal to the State fire marshal.

attached to MacLaurin's complaint containing factual information that apparently had not been before the fire chief, a Housing Court judge remanded the matter to the city for further investigation and determination whether automatic sprinklers were required.  Without conducting a hearing, the fire chief concluded that the additional documents had no bearing on his decision that automatic sprinklers were required, and, a few days after the orders of remand, issued essentially the same orders as he had previously (2013 orders).

In March, 2014, the same Housing Court judge who had ordered the remand conducted a hearing on the fire chief's 2013 orders, and, in July, 2014, the judge issued a decision affirming the orders that automatic sprinklers must be installed.  He stated that, "viewed through the lens" of the deferential standard of review applicable in a petition for certiorari, the fire chief's determination was not "so devoid of factual support as to be arbitrary and capricious."  The judge noted that the fire chief's decisions were not constrained by any controlling authority, the fire department had inspected the properties, and the fire chief had reached a conclusion based on the "extent of the renovation, its costs, and its costs relative to the overall value of the property; all factors that upon facts which 'reasonable men might deem proper' to support it" (citation omitted).  MacLaurin appealed from the Housing Court

judge's affirmance of the fire chief's orders, and we transferred the case to this court on our own motion.

Discussion. 1. Standard of review. MacLaurin filed complaints in the nature of certiorari, G. L. c. 249, § 4, in the absence of a statutory right of appeal. The purpose of an action in the nature of certiorari is "to relieve aggrieved parties from the injustice arising from errors of law committed in proceedings affecting their justiciable rights when no other means of relief are open." Figgs v. Boston Housing Auth., 469 Mass. 354, 361 (2014), quoting Swan v. Justices of the Superior Court, 222 Mass. 542, 544 (1916). The function of judicial "review in an action in the nature of certiorari is 'to correct substantial errors of law apparent on the record adversely affecting material rights.'" MacHenry v. Civil Service Comm'n, 40 Mass. App. Ct. 632, 634 (1996), quoting Commissioners of Civil Serv. v. Municipal Court of Boston, 369 Mass 84, 90 (1975). "To obtain certiorari review of an administrative decision, . . . three elements must be present:  (1) a judicial or quasi judicial proceeding, (2) from which there is no other reasonably adequate remedy, and (3) a substantial injury or injustice arising from the proceeding under review." Indeck v. Clients' Sec. Bd., 450 Mass. 379, 385 (2008). In the

circumstances, MacLaurin's complaint meets these requirements.[19]

Because the fire chief's determination was discretionary, a reviewing court in these circumstances is limited to determining whether the decision is legally erroneous or so devoid of factual support as to be arbitrary and capricious. State Bd. of Retirement v. Woodward, 446 Mass. 698, 703-704 (2006); Massachusetts Bay Transp. Auth. v. Auditor of the Commonwealth, 430 Mass. 783, 790-791 (2000). See Figgs v. Boston Housing Auth., supra at 361, quoting Garrity v. Conservation Comm'n of Hingham, 462 Mass. 779, 792 (2012) (standard of certiorari review "may vary according to the nature of the action for which review is sought"). Unlike the ordinary situation in reviewing an action for relief in the nature of certiorari, however, where the controlling precedent against which a reviewing court measures whether a decision is legally erroneous or lacks relevant factual support is more or less evident, in this case

---

[19] Although there was no adjudicatory hearing, the chief's investigation and written decisions, based on physical inspection of the premises and written documentation gathered from multiple sources, including documents submitted by MacLaurin and city records, were quasi judicial proceedings. See Frawley v. Police Comm'r of Cambridge, 473 Mass. 716, 726-727 (2016) (quasi judicial proceeding where city police chief determined that retired police officer's application for gun license did not meet statutory standard). See also Hoffer v. Board of Registration in Med., 461 Mass. 461, 457 (2012). It is undisputed that the absence of a statutory right of appeal left MacLaurin with no other route of appeal, and the injury asserted reaches, at least according to MacLaurin's documents, into hundreds of thousands of dollars.

there are no appellate decisions involving the statutory standard of "substantially rehabilitated so as to constitute the equivalent of new construction."  Nor are there interpretations of that standard by any authoritative Statewide body, given the absence of a statutory avenue of administrative review.  In such circumstances, deference is to be accorded the fire chief's decision only if the reviewing court can ascertain whether the decision comports with apparent statutory purposes.

2.  Statutory interpretation.  "Our primary duty in interpreting a statute is 'to effectuate the intent of the Legislature in enacting it.'"  Wheatley v. Massachusetts Insurers Insolvency Fund, 456 Mass. 594, 601 (2010), S.C., 465 Mass. 297 (2013), quoting International Org. of Masters v. Woods Hole, Martha's Vineyard & Nantucket S.S. Auth., 392 Mass. 811, 813 (1984).  In order to determine whether the fire chief's conclusion that automatic sprinklers must be installed in MacLaurin's buildings accurately reflects the legislative purpose and intent, we first must discern the meaning of "substantially rehabilitated so as to constitute the equivalent of new construction" within the residential sprinkler provision. To do so, we begin with the plain language of the provision. See Local 589, Amalgamated Transit Union v. Massachusetts Bay Transp. Auth., 392 Mass. 407, 415 (1984), quoting Bronstein v. Prudential Ins. Co of Am., 390 Mass. 701, 704 (1984)

("[s]tatutory language is the principal source of insight into legislative purpose").

"Words that are not defined in a statute[, as here,] should be given their usual and accepted meanings," derived "from sources presumably known to the statute's enactors, such as their use in other legal contexts and dictionary definitions." Seidman v. Newton, 452 Mass. 472, 477-478 (2008), quoting Commonwealth v. Zone Book, Inc., 372 Mass. 366, 369 (1977). We interpret the statutory language "according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated." Boston Police Patrolmen's Ass'n v. Boston, 435 Mass. 718, 719-720 (2002), quoting O'Brien v. Director of the Div. of Employment Sec., 393 Mass. 482, 487-488 (1984).

Because the fire chief appears to have considered the meaning of "substantially rehabilitated so as to constitute the equivalent of new construction" of a residential building of four or more units to be essentially the same as the meaning of "major alterations" in the context of renovation of an existing commercial building, G. L. c. 148, § 26G, we also examine the

ordinary meaning of "major alteration."[20]

To "rehabilitate" something generally means to return it from disuse or a poor condition to a useable condition.[21] "Alteration," on the other hand, implies a less extensive change to something already in existence.  See, e.g., The American Heritage Dictionary of the English Language 55 (3d ed. 1996) ("[t]he condition resulting from altering; modification"; to alter is "[t]o change or make different; modify"); Webster's Third New International Dictionary 63 (2002) ("the act or action

_____

[20] Apparently the only case in the Commonwealth to have addressed the meaning of the statutory standard in the residential sprinkler provision is a Superior Court judge's decision in Iodice vs. Newton, Mass. Superior Ct., No. 971098D (Middlesex County Oct. 1, 1999) (Iodice).  While recognizing that the "substantially rehabilitated . . ." standard is not identical to the "major alteration" standard of the commercial sprinkler provision, the judge concluded there that the legislative purposes underlying the commercial sprinkler provision and the residential sprinkler provision are similar, and that the factors applicable to a determination whether a commercial building has undergone "major alterations" under the standard established in Congregation Beth Sholom & Community Ctr., Inc. v. Building Comm'r of Framingham, 27 Mass. App. Ct. 276, 279 (1989) (Beth Sholom), are equally applicable in determining whether a residential building of four or more units has been "substantially rehabilitated as to be the equivalent of new construction."  See discussion of the fire chief's decision, part 3, infra.

[21] See The American Heritage Dictionary of the English Language 1521 (3d ed. 1996) (to rehabilitate is "[t]o restore to good health or useful life"; "[t]o restore to good condition, operation, or capacity"); Webster's Third New International Dictionary 1914 (2002) (rehabilitation is "the restoration of something damaged or deteriorated to a prior good condition); 8 Oxford English Dictionary 381 (1978) (rehabilitation is "[t]he action of replacing a thing in, or restoring it to, a previous condition or status").

of altering"; "the quality or state of being altered"; to alter is "to become different in some respect: undergo change usu. without resulting difference in essential nature"); 1 Oxford English Dictionary 255 (1978) ("[t]he action of altering or making some change in a thing"; to alter is "[t]o make [a thing] otherwise or different in some respect; to make some change in character, shape, condition, position, quantity, value, etc. without changing the thing itself for another; to modify, to change the appearance of").  Cf. 28 C.F.R. § 36.402(b) (2010). "Major" is defined as "greater in . . . rank, importance, or interest:  superior"; "notable or conspicuous in effect or scope"; "the greater. . . of two things, species, etc. that have a common designation"; "being greater than the rest."  See Webster's Third New International Dictionary 1363 (2002); 6 Oxford English Dictionary 57 (1978).  See also The American Heritage Dictionary of the English Language 1084 (3d ed. 1996). "Substantial" is commonly understood as something "[t]hat is, constitutes, or involves an essential part, point, or feature; essential, material"; "of or relating to the main part of something"; "to a large degree or in the main."  See 10 Oxford English Dictionary 54-55 (1978); Webster's Third New International Dictionary 2280 (2002).  See also The American Heritage Dictionary of the English Language 1791 (3d ed. 1996)

These differences in common meaning underscore that the

Legislature did not intend "major alteration" and "substantially rehabilitated" to be functionally synonymous. See Commonwealth v. Williamson, 462 Mass. 676, 679 (2012), quoting Commonwealth v. Young, 453 Mass. 707, 713 (we "presume, as we must, that the Legislature intended what the words of the statute say" [citation omitted]); City Bank & Trust Co. v. Board of Bank Incorporation, 346 Mass. 29, 31 (1963) ("The distinction between 'may' and 'shall' is not lightly to be held to have been overlooked in legislation"). Where "different words with different meaning" are used in different sections of a statute, see Commonwealth v. Millican, 449 Mass. 298, 301 (2007), citing Champigny v. Commonwealth, 422 Mass. 249, 252-253 (1996), "they cannot be construed interchangeably, but must be construed in relation to one another." Commonwealth v. Millican, supra.

Moreover, in electing to use the phrase "substantially rehabilitated," which is a term of art in certain contexts,[22] the

_____

[22] See Fifth Edition of the Massachusetts State Building Code (1990), 780 Code Mass. Regs.; User's Guide to the Fifth Edition, Secretary of the Commonwealth; United States Department of Housing and Urban Development, Nationally Applicable Recommended Rehabilitation Provisions (May 1997); United States Department of Housing and Urban Development, The Status of Building Regulations for Housing Rehabilitation -- A National Symposium, at iii, 3, 16-17, 24-25 (Aug. 1995); Boca National Fire Prevention Code, 1990: Model Building Regulations for the Protection of Public Health, Safety, and Welfare, National Fire Prevention Association (9th Ed.) (1990). Cf. Handbook of Injury and Violence Prevention, 6.4.1.2.2, at 104-105; 6.4.1.3.2, at 105-106 (2007). See also D. Madrzykowksi & R.P. Fleming, National Fire Sprinkler Association, Review of Sprinkler

Legislature clearly incorporated a very specific degree of modification which is considerably more extensive than what is required to constitute a "major alteration."  In the context of building construction, the phrase "substantial rehabilitation" has been used since at least the late 1960s to describe a building that has been modified so extensively that it has been rendered essentially "as good as new," with a concomitant extension of its expected useful life.[23]  Similar terms are used by the United States Department of Housing and Urban Development (HUD) in providing low-cost financing for creation of affordable housing;[24] by State agencies, builders, and housing advocates;[25]

---

Systems:  Research and Standards, NISTIR 6941, at 16 (rev. Dec. 2002); The Fire Protection Research Foundation, 2013 Cost of Residential Sprinkler Final Report (Sept. 2013), at 4.

[23] Section 235(R) of the National Housing Act, 12 U.S.C. 17152, Pub. L. 90-448 (Aug. 1, 1968) (no longer in effect), defined "substantial rehabilitation" as

> "the improvement of a unit in substandard condition to a decent, safe and sanitary level . . . . Units are in substandard condition when, while they may be structurally sound, they do not provide safe and adequate shelter, and in their present condition endanger the health, safety, or well-being of the occupants. . . .  The defects are either so critical or so widespread that the structure should be extensively repaired. . . .  The rehabilitation should be of such scope that, when completed, all the components in the house are operable and should not be anticipated to require any work or major expense over and above normal maintenance for the first one-fourth to one-third of the mortgage term."

[24] See Eidson v. Pierce, 745 F.2d 453, 457, 463 (7th Cir. 1984); Rehabilitation Guidelines 1980, no. 3, Statutory

and in State[26] and Federal tax law,[27] rent control law, and

certain historic preservation and environmental laws.[28]  See

Community For Creative Non-Violence v. Reid, 490 U.S. 730, 739

---

Guideline for Building Rehabilitation (1980).  See, e.g., L. Weiss, States and Urban Strategies. California's Urban Strategy, U.S. Department of Housing and Urban Development (Sept. 1980). See generally, W. Duncan, Substantial Rehabilitation & New Construction (Springer Science & Business Media, Nov. 11, 2013).

[25] See D. Listokin & B. Listokin, United States Department of Housing and Urban Development, Barriers to the Rehabilitation of Affordable Housing, vol. I, at 19 (May 2001) ("Minor rehab refers to repairs [activities short of replacements that maintain the home] and improvements [activities that enhance the residential structure] of a minor nature, such as replacing or refinishing cabinets, fixtures, and finishes.  Moderate rehab involves more extensive improvements, such as new wiring and heating and cooling systems, as well as new cabinets, fixtures, and finishes.  Substantial rehab entails removal of all interior walls and mechanical equipment and installation of a new space plan").  See id. at 7 n.7 ("with substantial rehab, the entire [house] is often gutted").

[26] See, e.g., Eilbott, P. and W. Kempey, New York City's tax abatement and exemption program for encouraging housing rehabilitation, Public Policy 26 (Fall 1978) at 571-597.

[27] See, e.g., 24 C.F.R. § 235.1206; 24 C.F.R. part 971, Appendix (no longer in effect); 12 U.S.C. § 1709(k) (2012).  See generally Cheverine & Hayes, Rehabilitation Tax Credit:  Does It Still Provide Incentives?, 10 Va. Tax. Rev. 167 (1990); Ramsey, Broder, Chiavieollo, Duffly, Dunnels, Larson, Sterling, & Vernon, The Cranston-Gonzalez National Affordable Housing Act -- An Overview, 28 Real Prop. Prob. & Tr. J. 177 (1993).

[28] See, e.g., National Historic Preservation Act of 1966, as codified in 54 U.S.C. §§ 300101, 3060103 ("substantially altered"); 26 C.F.R. § 1.48 ("qualified rehabilitated building"); Georgia Trust for Historic Preservation, The application of building and fire codes to existing buildings (1985); Tosi v. Boston Rent Control Bd., 13 Mass. App. Ct. 921 (1982) (landlord not entitled to tax exemption for substantial renovation of rent controlled units because units were not as good as new after renovation).  Cf. St. 1970, c. 842, § 1.

(1989) quoting National Labor Relations Bd. v. Amax Coal Co., 453 U.S. 322, 329 (1981) ("It is . . . well established that '[w]here Congress uses terms that have accumulated settled meaning under . . . the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms'"); G. L. c. 4, § 6, Third ("Words and phrases shall be construed according to the common and approved usage of the language; but technical words and phrases and such others as may have acquired a peculiar and appropriate meaning in law shall be construed and understood according to such meaning").  Furthermore, by the addition of the phrase "so as to constitute the equivalent of new construction," to modify the term "substantially rehabilitated," the Legislature emphasized, for those unfamiliar with the term of art, its intent that, to meet the statutory standard, an existing residential building must have been rendered "as good as new."

That the Legislature intended "substantially rehabilitated so as to constitute the equivalent of new construction" to mean something more than a "major alteration" is also apparent in the structure of the automatic sprinkler provisions within the fire prevention act, the process of their enactment, and the history of the enactment of the residential sprinkler provision.

First, the residential sprinkler provision was enacted on

January 2, 1990, see St. 1989, c. 642, § 1, eight months after the Appeals Court's decision in Congregation Beth Sholom & Community Center, Inc. v. Building Comm'r of Framingham, 27 Mass. App. Ct. 276, 279 (1989) (Beth Sholom), construing the meaning of "major alteration" under G. L. c. 148, § 26G, with respect to installation of automatic sprinklers in existing commercial buildings.[29]  Thus, when the Legislature was considering the proper statutory language to describe the extent of work necessary to require automatic sprinklers in existing

---

[29] Like the residential sprinkler provision, the language in the commercial sprinkler provision establishing when modifications are sufficiently extensive so as to trigger the requirement for installation of automatic sprinklers is not defined in the provision or elsewhere in the fire prevention act.  In concluding that "'major alterations' would include any work, not repairs, which is 'major' in scope or expenditure, and which results in changes affecting a substantial portion of the building," the Appeals Court turned to the several legislative objectives of the commercial sprinkler provision:

> "The automatic sprinkler requirement . . . is a fire safety measure.  The Legislature obviously intended . . . to give some protection to owners of older buildings against the large expense of installing sprinklers.  Fire safety concerns would predominate, however, when, because of certain changes to an older building, imposition of the sprinkler requirement would be reasonable.  This could occur . . . when such significant work is being done to it that the extra cost of installing sprinklers would be moderate in comparison to the total cost of the work contemplated.  It would also occur when the physical work being done is of such scope that the additional effort required to install sprinklers would be substantially less than it would have been if the building were intact."

Beth Sholom, supra at 279.

residential buildings of four or more units, it had before it the Appeals Court's then recently issued decision defining the extent of the work that had to be undertaken in order to require installation of automatic sprinklers in existing commercial buildings of more than 7,500 square feet. Yet it chose not to adopt the "major alteration" language. See Boehm v. Premier Ins. Co., 446 Mass. 689, 691 (2006), quoting Selectmen of Topsfield v. State Racing Comm'n, 324 Mass. 309, 313 (1949) ("[T]he Legislature is presumed 'to know the preexisting law and the decisions of this court'").

Second, the structure of the fire prevention act, and the course of enactment of the various automatic sprinkler provisions within the fire prevention act, indicate that each automatic sprinkler provision is applicable to a particular type of structure, being used for a specific purpose, and is intended to address the perceived risks of fire in uses of that type. The provisions expanding the types of buildings in which automatic sprinklers must be installed were added incrementally over a period of years, each following a widely publicized, devastating fire in a building of that type. The provisions do not contain the same language, do not reference each other, and do not incorporate a common set of definitions.

Consistent generally with the national pattern of automatic

sprinkler legislation,[30] the mandate that automatic sprinklers be installed in a particular type of structure, being used for a particular purpose, was extended over time under the fire prevention act. The mandate moved from covering larger structures and more dangerous uses that the Legislature deemed to create greater risks of harm, to smaller buildings and less dangerous uses, where fewer lives were perceived as being at risk.[31] At the same time, reflecting the concern that owners of existing buildings be afforded some protection from prohibitive

---

[30] See M. Bromann, The Design and Layout of Fire Sprinkler Systems 1-8 (2d ed. 2001); R.P. Fleming, National Fire Sprinkler Association, The Fire Sprinkler Situation in the United States, (2002); Shelhamer, How Fire Disaster Shaped the Evolution of the New York City Building Code, International Code Council, Building Safety Journal, vol. VIII, no. 6 (2010). See also T. Wieczorek & Perdu, The Debate About Residential Fire Sprinklers, PM Magazine, vol. 93, no. 7 (International City/County Management Association, Aug. 2011); The Network for Public Health Law, Residential Sprinkler Systems: Consideration of Policy and Litigation Strategies for Reducing Residential Fire Injuries, Residential Sprinkler Systems, Issue Brief (updated Dec. 2011); Fire Sprinkler History -- NFSA, NFPA & Tyco, 4 The Station House 1 (Feb. 2005); The History of the National Fire Sprinkler Association, http://www.nfsa.org/?page=NFSABIO [https:/perma.cc/65G4-2NMK]. Cf. Adomeit, The Station Nightclub Fire and Federal Jurisdictional Reach: The MultiDistrict, MultiParty, Multiforum Jurisdiction Act of 2002, 25 W. New Eng. L. Rev. 243 (2003).

[31] Legislation requiring the installation of automatic sprinklers first appeared, nationally, in the early 1900s, following a devastating fire in a clothing factory in New York in 1911 that resulted in more than one hundred deaths, see, e.g., Behrens, The Triangle Shirtwaist Company Fire of 1911: A Lesson in Legislative Manipulation, 62 Tex. L. Rev. 361 (1983), and is today governed by Federal requirements under the Occupational Safety and Health Administration. See 29 C.F.R. § 1910.159 (1981).

costs, the Legislature required automatic sprinklers first in new construction, then in existing buildings, and first in commercial buildings, where costs are more readily recouped, then in larger residential buildings.[32]

Under the fire prevention act, automatic sprinklers were first required in 1972, in new high rise buildings throughout the Commonwealth, for buildings built after March 1, 1974.  See G. L. c. 148, § 26A; St. 1973, c. 395, § 1.[33]  In 1982, following a deadly fire in Fall River,[34] the commercial sprinkler provision, applicable to new nonresidential buildings of more than 7,500 square feet, and existing such buildings when they underwent "major alterations," was adopted.  See St. 1982, c. 545, § 1.[35]  In 1986, following a rooming house fire that

---

[32] In the past several years, bills to extend the automatic sprinkler requirement to new one- and two-family buildings have been introduced several times, but have not been released from committee.  See, e.g., 2015 House Doc. No. 3475.

[33] This provision was enacted following a fire in a luxury high rise hotel that killed nine firefighters.

[34] See A Monumental Tribute:  Notre Dame's WWI Statue Survived Fire, Herald News, Aug. 2, 2009; Fire Destroys Landmark Church, N.Y. Times, May 12, 1982.

[35] Although initially a local option provision, in 2009 the commercial sprinkler provision became a Statewide mandate.  See St. 2008, c. 508, § 1.  While the revised language eliminated most of the waiver provisions that had been added to it, see St. 1986, c. 284, § 1; St. 1986, c. 526; G. L. c. 148, § 26G, fourth par.; St. 1989, c. 416, § 2, the provision for waivers or reasonable alternatives in buildings having "architectural or historical significance" was retained.  See St. 2008, c. 508,

resulted in multiple deaths, sprinklers were required in new and existing lodging and rooming houses.  See G. L. c. 148, § 26H. Again in 1986, after a major fire in the Prudential Center in Boston, sprinklers were required in existing, and not just new, high rise buildings across the Commonwealth, G. L. c. 148, § 26A 1/2, with a ten-year phase-in period.  St. 1986, c. 633, § 2.  In 1989, the lodging house sprinkler provision of G. L. c. 148, § 26H, was modified to include a five-year phase-in period after a municipality adopted it, St. 1989 c. 330, and, separately, to contain a statutory right of appeal.  St. 1989, c. 557, § 2.  One week after the then Governor signed the provision adding the phase-in period, a lodging house fire in Lynn resulted in numerous fatalities.  After unsuccessful efforts to repeal the phase-in period,[36] the residential sprinkler provision was enacted.  Explicitly incorporating lodging and rooming houses, already covered by the provisions of G. L. c. 148, § 26H, amongst an enumerated list of residential buildings, it became effective on January 2, 1990, less than six months after the fire in Lynn.  See G. L. c. 148, § 26I; St. 1989, c. 642, § 1.

---

§ 1.

[36] See Task Force, State House News Service (Aug. 21, 1989); Coakely, New Law Diluted Sprinkler Regulation, Boston Globe, Aug. 10, 1989; Preventable Deaths in Lynn, Boston Globe, Editorial, Aug. 15, 1989.

The language of the residential sprinkler provision has remained virtually unchanged since its enactment. For municipalities choosing to adopt it, the provision requires sprinklers in a wide variety of buildings:[37] new multi-unit residential apartment buildings of more than four units; new residential buildings such as fraternities, dormitories, hotels, motels, and group homes; and existing buildings of these types if they are substantially rehabilitated so as to constitute the equivalent of new construction. Unlike any other provision of the fire prevention act, the residential sprinkler provision did not include a phase-in period immediately following its enactment, and does not afford a statutory right of appeal. Also unlike the other sprinkler provisions, it does not contain any mechanism for waivers, alternatives, or acceptable modifications to the sprinkler requirement.

---

[37] "In a city, town or district which accepts the provisions of this section, any building hereafter constructed or hereafter substantially rehabilitated so as to constitute the equivalent of new construction and occupied in whole or in part for residential purposes and containing not less than four dwelling units including, but not limited to, lodging houses, boarding houses, fraternity houses, dormitories, apartments, townhouses, condominiums, hotels, motels and group residences, shall be equipped with an approved system of automatic sprinklers in accordance with the provisions of the state building code. In the event that adequate water supply is not available, the head of the fire department shall permit the installation of such other fire suppressant systems as are prescribed by the state building code in lieu of automatic sprinklers. Owners of buildings with approved and properly maintained installations may be eligible for a rate reduction on fire insurance." G. L. c. 148, § 26I.

Finally, in 2004, following a widely publicized fire with multiple fatalities at a Rhode Island nightclub, sprinklers were required to be retrofitted in existing nightclubs, bars, discotheque and dance halls, and other places designed or used for "similar entertainment purposes" with a capacity of more than one hundred people.  See G. L. c. 148, § 26G 1/2; St. 2004, c. 304, § 5.  This legislation effectively created a retrofit requirement for small establishments, because larger such venues already were required to have sprinklers under the terms of the commercial sprinkler provision.  Certain uses of structures within this category -- "a house of worship, restaurant, lecture hall, auditorium, state or local government building, educational function facility, or other similar place of assembly" -- were apparently perceived as being less dangerous and were exempted from the sprinkler requirement.  G. L. c. 148, § 26G 1/2, fourth par.

While phase-in provisions were adopted for other types of existing buildings, only the commercial sprinkler provision and the residential sprinkler provision contain a two-part standard requiring automatic sprinklers in new buildings and when a certain level of modification is made to an existing structure, reflecting their shared legislative objective of enhancing fire safety, while at the same time affording protection to owners of existing buildings.  By requiring the installation only when

building modifications are of a specific order of magnitude (a "major alteration" or "substantially rehabilitated so as to constitute the equivalent of new construction"), owners of such existing buildings are spared the significant costs of sprinkler installation when performing what amounts to ordinary, even if costly, upkeep of their buildings.

At the same time, however, the differences in statutory language, and the Legislature's recognition of the varying degrees of dangerousness amongst different types of buildings, indicate the legislative intent to impose distinct thresholds for requiring installation of sprinklers in existing qualifying commercial buildings[38] rather than in existing qualifying

---

[38] Large existing commercial buildings may present the risks inherent in a "funnel effect," where many people try to reach few exits through narrow corridors or doorways. In addition, certain aspects of the construction of many commercial buildings, such as open ducts that are used for heating and cooling systems, allow fire to spread rapidly throughout the building. By the same token, however, the costs of sprinkler installation may be significantly lower in such a building than in an older residential building, because the large open spaces and construction techniques such as dropped ceilings tend to facilitate installation. See D. Madrzykowksi & R.P. Fleming, Review of Residential Sprinkler Systems: Research and Standards, NISTIR 6941 (rev. Dec. 2002). See also M. Bromann, The Design and Layout of Fire Sprinkler Systems, at 15 (2d ed. 2001).

Similarly, studies have shown that the use of modern construction materials in new residential buildings has resulted in fires that combust and spread much more quickly than in older structures, because of the more volatile nature of the materials used. Older residential buildings, on the other hand, tend to be built of materials such as stone, brick, and plaster, which

residential buildings.  Accordingly, establishing that an existing residential building has undergone modifications significant enough to qualify as "major alterations" is not sufficient to show that the building has been substantially rehabilitated so as to constitute the equivalent of new construction.

We conclude that the residential sprinkler standard under G. L. c. 148, § 26I, is satisfied when rehabilitative work is so extensive that the building itself, considered as a whole, has been rendered "the equivalent of new construction," whether in terms of the materials and construction techniques used, the building's systems, its market value, its expected future useful life, or other comparable measures of equivalence to new construction.  See United States Department of Housing and Urban Development, Nationally Applicable Recommended Rehabilitation Provisions (May 1997).  This understanding of the statutory standard is consistent with the dual legislative purposes of enhancing fire safety and protecting property owners of existing residential buildings from the disproportionate costs of automatic sprinkler installation when attempting to perform

---

are fire-retardant.  Likewise, while newer residential buildings often have air conditioning ducts that allow fire to spread rapidly, older residential buildings generally do not.  See Roman, New Fires, New Tactics, National Fire Protection Association Journal (Dec. 29, 2014).  Thus, the need for sprinklers in a new residential building may be greater than in an older one.

desirable ordinary repairs and maintenance, even if extensive in nature, to retain a building in a habitable condition.[39]  See, e.g., 1010 Memorial Dr. Tenants Corp. v. Fire Chief of Cambridge & another, 424 Mass. 661, 664-665 (1997).  This, in turn, furthers the ancillary goals of retaining and adding to existing housing stock, as well as avoiding an increase in abandoned residential buildings,[40] which themselves present an increased risk of fire.

3.  Fire chief's decisions.  With this standard in mind, we examine the fire chief's decisions to ascertain whether they comport with the statutory objectives.  Here, in reaching his determination that MacLaurin's buildings had been substantially

---

[39] See Bukowksi & Babrauskas, Developing Rational, Performance-based Fire Safety Requirements in Model Building Codes, Fire and Materials, vol. 18, at 173, 176, 180-181 (1994); D. Madrzykowski & R.P. Fleming, Review of Residential Sprinkler Systems:  Research and Standards, National Fire Sprinkler Association, NISTIR 6941, at 5, 16 (rev. Dec. 2002).  See also R.P. Fleming, The Fire Sprinkler Situation in the United States (2012).

[40] In 1983, then Governor Michael Dukakis announced that homelessness was his highest social service priority, pointing to estimates that Massachusetts had somewhere between 5,000 to 10,000 homeless residents.  Among other initiatives during his term in office, public assistance requirements were amended so that homeless persons could receive benefits, the Legislature enacted a stringent condominium conversion law requiring four years' notification to tenants, and funding was obtained to create thousands of new and rehabilitated housing units for low income residents.  See J. Alter, S. Doherty, N. Finke Greenbert, S. Agrest, V.E. Smith, G. Raine, Homelessness in America, Newsweek, Jan. 2, 1984, at 12-13, in Housing the Homeless, J. Erickson and C. Wilhelm, eds. (Rutgers, 1986), republished with a new introduction by J. Erickson (2012).

rehabilitated so as to be the equivalent of new construction, the chief stated that he looked to decisions of the automatic sprinkler appeals board (construing G. L. c. 148, § 26G), and to provisions in the State building code. While the decisions do not state so explicitly, they suggest the fire chief's familiarity with Beth Sholom, supra at 279, the only appellate decision to have construed the "major alteration" standard in the commercial sprinkler provision, requiring installation of sprinklers in existing commercial buildings of more than 7,500 square feet whenever construction is extensive enough to be a "major alteration." The chief also appears to have been cognizant of a 1999 Superior Court judge's decision construing the residential sprinkler provision. See note 20, supra.

The fire chief, however, did not rely expressly on any identified interpretation of the statutory standard, nor did he set forth such an interpretation.[41] If anything, the decisions suggest rather that the "major alteration" and "substantially rehabilitated so as to constitute the equivalent of new

---

[41] The February, 2012 (Main Street), and March, 2012 (Essex Street), orders generally relied on the same factors: reported observations from the inspections in February, 2012; various municipal records, including fire department records; and documents that had been submitted by MacLaurin to the building inspector during the course of construction. In the 2013 orders, the fire chief noted also that he had sought guidance in decisions of the automatic sprinkler appeals board and the State building code, both with reference to the commercial sprinkler provision.

construction" standards were viewed as functionally equivalent.
The decisions neither make clear what facts the fire chief found
and applied, nor how he weighed their relative importance.[42]
While expressing some skepticism as to the validity of
MacLaurin's total project cost and sprinkler installation
estimates, the decisions do not reflect any assessment of the
relative costs of sprinkler installation compared with total
project costs,[43] a factor that is identified in both Beth Sholom,

---

[42] The fire chief stated, without discussion, that the work
included upgrades to "all major systems" (plumbing, electrical,
and gas); that each building, which had sustained previous fire
damage, was of a "balloon" construction with a wooden frame that
would allow a fire to move rapidly between floors; that the
actual work undertaken would have facilitated the installation
of automatic sprinklers; and that, at least as to Essex Street,
MacLaurin had submitted automatic sprinkler plans in conjunction
with his initial applications for building permits.  The chief
commented that he viewed the submission of these plans as an
indication that, from its inception, MacLaurin had considered
the project to be a substantial rehabilitation (a view MacLaurin
disputes).

[43] While the fire chief stated that he considered the cost
of the projects, the particular work involved, and the relative
cost of sprinklers in each building, his 2012 orders questioned
the accuracy of MacLaurin's claimed total project costs of
$207,062 (Essex Street) and $178,353 (later adjusted to
$186,851) (Main Street), and of his projected costs to install
automatic sprinklers of $124,800 (Essex Street) and $133,700
(Main Street), suggesting that the total project costs were too
low and the sprinkler installation estimates were too high.  The
fire chief did not provide alternative figures.

The 2013 orders adopted MacLaurin's figures without
comment, and did not address the costs of sprinkler
installation.  Those orders contain no discussion of the costs
of sprinklers, other than a comment that the costs of
installation would have been "substantially less" had sprinklers

supra at 279, and Iodice vs. Newton, Mass. Superior Ct., No. 971098D (Middlesex County Oct. 1, 1999) (Iodice), as being relevant to the determination whether work undertaken is a "major alteration."  Further, nothing in the decisions indicates consideration of the dual statutory objectives, and whether the modifications undertaken were so substantial that they constituted "the equivalent of new construction."

The difficulty of judicial review is enhanced by the absence of express findings of fact as to key points, certain of which MacLaurin disputes.  For example, in addition to the record being unclear as to what the project costs and sprinkler installation cost estimates were determined to be, the record is at least as unclear as to specific aspects of the scope and nature of the actual physical work performed.  Significantly, given its importance relative to the costs and difficulty of automatic sprinkler installation, the fire chief made no findings as to the contested issue of the extent of the walls and ceilings that were opened, replaced, or repaired by being covered with gypsum board.[44]

_____

been installed when the permits issued.  The only discussion of costs in the 2013 orders compares the total project costs with the (extremely low) assessed values of the buildings.

[44] In particular, as to the Essex Street building, the fire chief noted that "substantial portions of both walls and ceilings throughout the entire building were opened up," a point that MacLaurin disputes as incorrect and inconsistent with

In light of the foregoing, the Housing Court judge was not in a position to review the fire chief's decisions under G. L. c. 148, § 26I, and a remand for further proceedings, with the guidance we provide, is necessary. On remand, after taking such additional evidence as may be appropriate, and applying the standard we have identified, the fire chief should clearly determine and identify the particular facts on which he bases his conclusion whether the rehabilitative work undertaken on each building was so substantial as to be the equivalent of new construction.

4. <u>Whether a hearing was required</u>. MacLaurin also argues that the fire chief acted arbitrarily and capriciously in failing to conduct an evidentiary hearing in order to allow him to present evidence and be heard. MacLaurin contends that such a hearing was necessary to establish an acceptable record for review on appeal, based on written findings of fact and a clearly articulated rationale for the decision made. He maintains as well that an evidentiary hearing is constitutionally mandated before an order may issue requiring a residential property owner to pay for a potentially cost prohibitive sprinkler system, and that the decision to require

documentation for the project. Moreover, with respect to the Main Street building, as to which the fire chief also concluded that sprinkler installation would have been facilitated by virtue of the work done there, the record does not reflect any mention of walls or ceilings being similarly "opened up."

installation of automatic sprinklers without a hearing was a violation of his due process rights.

As noted, the residential sprinkler provision is the only section of the fire prevention act requiring the installation of automatic sprinklers that does not contain language affording a statutory right of appeal.[45]  In support of his contention that a hearing was constitutionally mandated, MacLaurin points to the Appeals Court's decision in Yerardi's Moody St. Restaurant & Lounge v. Selectmen of Randolph, 19 Mass. App. Ct. 296, 302-304 (1985) (Yerardi's), citing Milligan v. Board of Registration in Pharmacy, 348 Mass. 491, 495-496 (1965) (Milligan).  In the Yerardi's case, citing Konstantopoulos v. Whately, 384 Mass. 123, 132 (1981), the court held that a restaurant owner was entitled to a hearing when a city board denied his application for a later closing hour, which had been permitted to other nearby restaurants, even though the licensing statute contained no right to a hearing after the denial of a request to expand closing hours.[46]  Without determining whether the denial of an

---

[45] Amendments to the residential sprinkler provision that would provide a statutory right of appeal have been introduced a number of times; none have come to a vote.  See, e.g., 2015 House Doc. No. 2143; 2013 House Doc. No. 982.

[46] As here, other provisions of the statute applicable in Yerardi's Moody St. Restaurant & Lounge v. Selectmen of Randolph, 19 Mass. App. Ct. 296, 299-300 (1985), such as an order to reduce licensed operating hours, did provide a right to a hearing.

extension of licensing hours was of constitutional dimension, the court in the Yerardi's case concluded that the aggrieved restaurant owner was nonetheless entitled to notice and a hearing under a long-standing common law "ethic that pervades our legal system" "where government exerts power upon an individual in a matter of consequence." Yerardi's, supra at 303, citing Milligan, supra.

The situation here is, to some extent, similar, and we need not reach the question whether the fire chief's decision was of constitutional dimension to conclude that, in the circumstances here, a hearing would have been appropriate.[47] There was no

---

[47] Consideration might well have been given to holding such a hearing early in the project, when adjustments could be made most cost-effectively, or another form of fire prevention system instead deemed sufficient, the types of resolutions that the automatic sprinkler appeals board is authorized to make. See discussions in Iodice, supra, and Beth Sholom, supra. We note that many of the factors relied upon to determine that sprinklers are necessary in this case (the age of the buildings, the type of construction, the history of a previous fire) were known when the building permits issued. A hearing early in the process might have allowed resolution of material factual questions, such as the extent and scope of the project (particularly the extent to which walls and ceilings would be replaced) and the cost of installation of a particular sprinkler system, which are of significance in determining whether sprinklers are required.

Here, for example, an expert report indicated some question, with respect to the Main Street building and its connection to the street, as to whether water pressure from the street would be adequate in the building to support a sprinkler system. Were the water supply thereby inadequate, MacLaurin might be statutorily exempt from any requirement to install sprinklers. See G. L. c. 148, § 26I.

controlling decisional authority as to the applicable standard, key facts were in dispute, and there is no statutory avenue for review. The fire chief's orders clearly "exert[ed] power upon an individual in a matter of consequence." Yerardi's, supra at 303, citing Milligan, supra at 495-496. While determinations such as these are made in the exercise of discretion, that discretion is not unlimited. "[B]esides the unreviewable elements in [such] decisions, there are other elements submissible to the test of elementary justice that is invoked by the words 'arbitrary or capricious.'" Id. at 301. In these particular circumstances, an appropriate opportunity for MacLaurin to be heard was warranted.

Conclusion. The matter is remanded to the Housing Court for entry of an order vacating the judgment affirming the fire chief's determination that automatic sprinklers are required in the buildings at 213-215 Chestnut Street/108-116 Essex Street and 268-272 Main Street/11 Spring Street, and remanding the matter to the Holyoke fire department. On remand, the head of the fire department shall consider anew, consistent with this opinion and after evaluation of the existing record and such additional information as may be submitted by either party, whether the properties have been substantially rehabilitated within the meaning of G. L. c. 148, § 26I, so as to require the installation of automatic sprinkler systems. Thereafter, if

necessary, further proceedings consistent with this opinion will be had in the Housing Court.

So ordered.