NOTICE: All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports. If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12222

GEORGE T. KOSHY  vs.  ANUPAM SACHDEV.

Middlesex.    May 2, 2017. - September 14, 2017.

Present:  Gants, C.J., Lenk, Hines, Gaziano, Lowy, Budd,
& Cypher, JJ.[1]

Corporation, Dissolution, Officers and agents.  Practice, Civil,
    Contempt.  Contempt.

Civil action commenced in the Superior Court Department on
June 28, 2012.

The case was heard by Bruce R. Henry, J., and a complaint
for contempt, filed on March 2, 2015, was also heard by him.

The Supreme Judicial Court on its own initiative
transferred the case from the Appeals Court.

Charles M. Waters for the plaintiff.
Maureen Mulligan (Timothy M. Pomarole also present) for the
defendant.
Thomas J. Carey, Jr., for Brian JM Quinn & others, amici
curiae, submitted a brief.

LENK, J.  We are called upon in this case to construe for

---

[1] Justice Hines participated in the deliberation on this
case prior to her retirement.

the first time G. L. c. 156D, § 14.30, the corporate dissolution statute. That statute allows a shareholder to petition a judge of the Superior Court to dissolve a corporation in the event of a deadlock between its directors. See G. L. c. 156D, § 14.30 (2) (i).

George T. Koshy and Anupam Sachdev are the sole shareholders and directors of Indus Systems, Inc. (Indus). After years of deepening dissension and acrimony between the two, Koshy filed a petition in the Superior Court in 2012, pursuant to the corporate dissolution statute, seeking to dissolve Indus. Koshy also brought claims against Sachdev for breach of fiduciary duties and, after a jury-waived trial had taken place, but prior to the issuance of the judge's decision, filed a separate claim for contempt of court. The judge rejected all of Koshy's claims and Sachdev's counterclaims, and dismissed Koshy's complaint for contempt. Koshy appealed, and we transferred the matter to this court on our own motion.

We conclude that the utter impasse as to fundamental matters of corporate governance and operations shown to exist in these circumstances gave rise to a state of "true deadlock" such that the remedy of dissolution provided by the statute is permissible. See comment to G. L. c. 156D, § 14.30, 25A Mass. Gen. Laws Ann. at 71 (Thomson/West 2005). Since dissolution is a discretionary remedy, however, we remand the matter to the

Superior Court for a determination whether it is the appropriate remedy in these circumstances. In addition, because a number of the claims in the complaint for contempt were not raised at trial, we vacate and set aside the judgment dismissing that complaint, and remand the matter for consideration of the allegations in the complaint concerning conduct that occurred after the trial.[2]

1. Background. We recite the facts found by the trial judge,[3] supplemented with references to undisputed facts in the record.

a. Formation and growth of Indus. As one of the motion judges observed, "[t]his case concerns the demise of a long-standing business relationship between two men who were once close friends." The parties formed Indus in April, 1987, after working together for several years at another company. Indus provides "computer aided design" (CAD) services, creating and storing digital renderings of "existing manual drawings, sketches and other information supplied by client organizations." Koshy and Sachdev each own fifty per cent of Indus's shares and serve as its sole directors. They are both authorized to act on the company's behalf.

---

[2] We acknowledge the amicus brief submitted by Brian JM Quinn, Niloufar Abae, and Alex Pena.

[3] At argument before us, the parties acknowledged that they do not contest the judge's factual findings.

After a few years of growing pains, Indus developed a steady market for its services. By the end of 1997, the company was generating revenues of approximately $700,000 annually. In June, 1999, Indus was awarded a United States Government Services Administration contract, which allowed it to bid on projects for agencies of the Federal government. To help meet the new wave of demand created by this contract, the parties established eSystems Software Pvt. Ltd. (eSystems), an Indian corporation, to provide support services to Indus.[4]

Building upon its success, Indus obtained a Federal "streamlined technology acquisition resources for services" contract (STARS contract) in 2004. It allowed government clients to purchase products and services from Indus without having to go through a competitive bidding process. The STARS contract, which was effective through November 30, 2011, gave Indus access to a new client base and provided approximately sixty per cent of the company's revenue from 2004 to 2010. By 2007, Indus's revenues exceeded $2 million annually.

b. Parties' dispute. Sometime in the late 2000s, the relationship between the parties began to fall apart. They developed a fundamental difference of opinion concerning the future of Indus. While Koshy wanted the company to focus

---

[4] George T. Koshy and Anupam Sachdev each own 49.9 per cent of eSystems Software Pvt. Ltd. (eSystems). It is not apparent from the record who owns the remaining shares.

primarily on its existing services for government agencies, Sachdev believed that it should explore new markets. Both parties viewed their counterpart's vision of Indus's future as gravely flawed. Koshy saw Sachdev's efforts to develop new markets as quixotic and costly, while Sachdev considered Koshy's focus on existing clients myopic and shortsighted. This difference in viewpoints bred growing distrust as well, as is evident from a dispute arising around 2010 in connection with payments made from Indus to eSystems. While Sachdev preferred to make prepayments to eSystems for services to be performed, Koshy favored payments only for services rendered. Koshy believed that prepayments, which could not easily be recovered due to jurisdictional obstacles, provided Sachdev with a means clandestinely to direct company resources into new projects. Notwithstanding Koshy's stated concerns, Sachdev routinely made prepayments to eSystems without consulting with Koshy.

As these disagreements strained the parties' relationship, an incident in the fall of 2011 furthered its disintegration. At that time, Indus had approximately $1.4 million in retained earnings. Koshy wanted this money to be paid out to himself and Sachdev as a distribution, while Sachdev did not. In November, 2011, Koshy wrote himself a check from Indus's corporate account, in the amount of $690,000, as a distribution, without Sachdev's consent. Koshy encouraged Sachdev, who was in

India at the time, to take a matching distribution. Sachdev instead reacted by effectively locking Koshy out of the company. He initiated a lawsuit against Koshy on behalf of Indus, seeking a return of the distribution; stopped payment of Koshy's salary; terminated his company credit cards; and changed the locks on the door of Indus's offices. He also refused to consent to a tax distribution to the parties, as had been the practice in prior years. Koshy subsequently placed the $690,000 in an escrow account.

As this dispute was ongoing, each party offered to buy out the other, based on evaluations of Indus's worth created by consultants that each had hired. Sachdev offered to purchase Koshy's shares for $480,000. Koshy rejected that offer and tendered his own offer to purchase Sachdev's shares for approximately $2.8 million; Sachdev rejected that proposal. Ultimately, the $690,000 was returned to Indus, and in June, 2012, the complaint was dismissed. Koshy's salary, company credit cards, and access to his office were restored. The relationship between the parties however, continued to spiral downward.

The parties' welling antipathy for and toxic distrust of each other inevitably began to impinge upon the day-to-day operations of Indus. In December, 2011, without consulting Koshy, Sachdev hired Michael Xifaras to help with the company's

sales.  Xifaras replaced Roger Geilen, a long-time Indus salesperson, who had worked largely with Koshy.  Koshy and Xifaras did not get along, as Koshy believed that Sachdev had hired Xifaras, in effect, as his replacement.  The hostility between the two broke out into open conflict when Xifaras sent an extremely critical electronic mail message to Koshy, with a copy to Sachdev, which included a variety of insults.[5]  In response, Koshy informed Sachdev that he would be firing Xifaras, and provided Xifaras notice of the termination.  Sachdev responded by saying that he agreed with Xifaras's criticisms and that Koshy had no authority to fire employees without Sachdev's consent; Xifaras retained his position at Indus.  A few months later, Koshy again attempted to terminate Xifaras, with the same result.  At the time of trial in October, 2013, Xifaras still worked for Indus.

Finally, in June, 2012, Koshy commenced in the Superior Court the underlying action in this case.  The complaint asserted that Sachdev had committed a breach of his fiduciary duty to Koshy, as well as the implied covenant of good faith and fair dealing; the complaint also asserted that the parties were deadlocked and sought corporate dissolution on that ground.

---

[5] Among other things, Xifaras called Koshy "the greatest impediment for the company achieving its potential" and "dishonest and self serving."  He also said that Koshy did "not have the experience and knowledge to lead."

Sachdev filed counterclaims alleging breach of fiduciary duties by Koshy and abuse of process.

Koshy also sought a preliminary injunction enjoining Sachdev from taking certain actions purportedly intended to freeze out Koshy. A Superior Court judge (who was not the trial judge) granted the motion in part, enjoining Sachdev from (1) blocking or impeding regular tax distributions to Koshy; (2) making any non-payroll-related disbursement or expenditure in excess of $5,000 on behalf of Indus without providing written notice to Koshy in advance; (3) hiring or firing any employee without providing written notice to Koshy in advance; (4) making any payments on behalf of Indus to eSystems for services not yet performed without Koshy's prior written consent; and (5) taking any action for the purpose of "forcing or pressuring [Koshy] to sell his shares for less than fair market value." Shortly thereafter, Sachdev approved a tax distribution to the parties. In September, 2012, Sachdev sought to have the preliminary injunction dissolved. The judge denied the motion, and instead modified the order such that the same provisions also were applicable to Koshy.

In March, 2015, nearly one and one-half years after the trial in October, 2013, and while a decision on the issues raised at trial was still pending, Koshy filed a complaint seeking a judgment of contempt against Sachdev for asserted

repeated violations of the preliminary injunction. The trial judge ultimately dismissed the complaint for contempt when he issued his ruling in August, 2015, on the claims litigated at trial.

c. <u>Trial proceedings</u>. Following an eight-day, jury-waived trial, the judge denied all of Koshy's claims and Sachdev's counterclaims. He rejected Koshy's claim that the parties were deadlocked such that dissolution was appropriate. He also concluded that Sachdev had not committed a breach of his fiduciary duty to Koshy, because Sachdev had had a "legitimate business purpose" for all of the conduct Koshy challenged. For similar reasons, the judge denied Koshy's claim for breach of the covenant of good faith and fair dealing. The judge also dismissed Koshy's complaint for contempt on the ground that it "rehash[ed]" issues that had been litigated at trial. Concluding that Koshy had neither committed a breach of his fiduciary duty to Sachdev nor brought his claims for an ulterior or illegitimate purpose, the judge also denied Sachdev's counterclaims.

Koshy appealed from the judgment,[6] and we transferred the case to this court on our own motion.

---

[6] Sachdev initially cross-appealed from the trial judge's dismissal of his claims against Koshy for breach of fiduciary duties and abuse of process. He ultimately decided not to pursue the appeal.

2. <u>Discussion</u>. On appeal, Koshy raises three arguments. He contends that the trial judge erred in concluding that the parties were not deadlocked; in denying Koshy's claim for breach of fiduciary duty; and in dismissing the complaint for contempt. We address each in turn.

a. <u>True deadlock</u>. i. <u>Statutory overview</u>. The corporate dissolution statute, G. L. c. 156D, § 14.30, provides "grounds for the judicial dissolution of corporations at the request of the [C]ommonwealth, a shareholder, a creditor, or a corporation which has commenced voluntary dissolution." See comment to G. L. c. 156D, § 14.30, 25A Mass. Gen. Laws Ann. at 70.[7] The statute allows any shareholder or group of shareholders who hold forty per cent of "the total combined voting power of all the shares of [a] corporation's stock outstanding" and are "entitled to vote on the question of dissolution" to petition the Superior Court for dissolution of the corporation on the basis of director or shareholder deadlock. See G. L. c. 156D, § 14.30 (2).

A judge may allow a petition for dissolution due to deadlock between a corporation's directors only in cases of

---

[7] The corporate dissolution statute, G. L. c. 156D, is part of the Massachusetts Business Corporation Act. In interpreting the statute, we are guided by the "comments prepared by the task force . . . that drafted the act, 'which included more than fifty experienced Massachusetts corporate lawyers.'" See <u>Chitwood</u> v. <u>Vertex Pharms., Inc.</u>, 476 Mass. 667, 669 (2017), quoting <u>Halebian</u> v. <u>Berv</u>, 457 Mass. 620, 625 (2010).

"true deadlock."  See comment to G. L. c. 156D, § 14.30, 25A Mass. Gen. Laws Ann. at 71 ("the general policy of Massachusetts corporation law [is] that involuntary dissolution should be available as a mechanism for resolving internal corporate disputes only in the case of true deadlock").  To establish the existence of a "true deadlock" between directors, the petitioning party must prove that (1) "the directors are deadlocked in the management of the corporate affairs"; (2) "the shareholders are unable to break the deadlock"; and (3) "irreparable injury to the corporation is threatened or being suffered."  See G. L. c. 156D, § 14.30 (2) (i) (§ 14.30 [2] [i]).[8]  If the petitioning party can establish a "true deadlock," then the statute vests the judge with the discretion to order dissolution as a remedy.  G. L. c. 156D, § 14.30.

A judge's determination whether a true deadlock exists is a matter of law, reviewed de novo.  Cf. Merola v. Exergen Corp., 423 Mass. 461, 463 (1996) (determination whether actions constituted breach of fiduciary duties was matter of law).  Whether such deadlock warrants dissolution is a matter of discretion.  See comment to G. L. c. 156D, § 14.30, 25A Mass. Gen. Laws Ann. at 70 ("This section states that a court 'may' order dissolution if a ground for dissolution exists.  Thus

---

[8] The statute does not define any of these terms.

there is discretion on the part of the court as to whether dissolution is appropriate even though grounds exist under the specific circumstances").

ii. Analysis. We have not previously had occasion to address the corporate dissolution statute. As with all statutes, "[o]ur primary duty in interpreting [it] is 'to effectuate the intent of the Legislature in enacting it.'" MacLaurin v. Holyoke, 475 Mass. 231, 238 (2016), quoting Wheatley v. Massachusetts Insurers Insolvency Fund, 456 Mass. 594, 601 (2010), S.C., 465 Mass. 297 (2013).

A. Deadlock. The first part of the test for "true deadlock" concerns whether the "directors are deadlocked in the management of the corporate affairs." G. L. c. 156D, § 14.30 (2) (i). Since neither the statute nor the drafters' comment defines the term "deadlock," we look to its ordinary meaning. See International Fid. Ins. Co. v. Wilson, 387 Mass. 841, 853 (1983) ("We begin with the canon of statutory construction that the primary source of insight into the intent of the Legislature is the language of the statute"). The plain meaning of "deadlock" is "a state in which progress is impossible, as in a dispute, produced by the counteraction of opposing forces." Webster's New Universal Unabridged Dictionary 512 (2003). Other courts to have considered the matter have reached a comparable understanding of the term. See Donovan v.

Quade, 830 F. Supp. 2d 460, 489 (N.D. Ill. 2011) (deadlock existed due to directors' mutual distrust, lack of communication, and inability harmoniously to manage affairs of corporation); Belio v. Panorama Optics, Inc., 33 Cal. App. 4th 1096, 1103-1104 (1995) (deadlock exists when board has even number of directors who are equally divided or incapable of electing successor board); Black v. Graham, 266 Ga. 154, 155 (1996) (deadlock occurs when corporation has two shareholders who are "wholly unable to agree on the management of the business").

Based on this common definition, we conclude that at least four factors are relevant in determining whether a deadlock exists. The first factor is whether irreconcilable differences between the directors of a corporation have resulted in "corporate paralysis." See Laskey v. L. & L. Manchester Drive-In, Inc., 216 A.2d 310, 314-315 (Me. 1966); Petition of Collins-Doan Co., 3 N.J. 382, 395 (1949); Kim, The Provisional Director Remedy for Corporate Deadlock: A Proposed Model Statute, 60 Wash. & Lee L. Rev. 111, 119 (2003) (Kim) ("Deadlock generally refers to 'an impasse in corporate decisional processes'" [citation omitted]). By "corporate paralysis," we refer to a stalemate between the directors concerning "one of the primary functions of management." See Laskey, supra at 314. Examples of such primary functions include payroll, client services,

hiring and retention of employees, and corporate strategy.

A second factor in discerning whether a deadlock exists is the size of the corporation at issue. A deadlock is more likely to occur in a small or closely held corporation, particularly one where ownership is divided on an even basis between two shareholder-directors. See comment to G. L. c. 156D, § 14.30, 25A Mass. Gen. Laws Ann. at 72 (dissolution remedy "particularly important in small or family-held corporations in which share ownership may be divided on a [fifty-fifty] basis"); Kim, supra at 121 ("The distinguishing features of close corporations make them particularly vulnerable to deadlock"). Moreover, in closely held corporations, the lack of a ready market for a shareholder's stock, and the greater likelihood that a shareholder is reliant on the corporation for a salary, tends to increase the potential for deadlock and accompanying oppressive tactics. See Donahue v. Rodd Electrotype Co. of New England, 367 Mass. 578, 588-589 (1975) (structure of close corporation can lend itself to oppressive conduct); Kim, supra at 121-122.[9]

A third relevant factor in determining whether deadlock has occurred is an indication that a party has manufactured a

---

[9] A claim of oppressive shareholder conduct of the sort described in Donahue v. Rodd Electrotype Co. of New England, 367 Mass. 578, 580-584 (1975), however, is not a necessary prerequisite to a finding of deadlock. While a breach of the directors' fiduciary duties would be relevant to whether a deadlock exists between them, a deadlock could result even in instances where the directors are acting in good faith.

dispute in order to engineer a deadlock. In such circumstances, a court should view the party's claim with skepticism. See comment to G. L. c. 156D, § 14.30, 25A Mass. Gen. Laws Ann. at 71 (corporate dissolution statute not intended to permit dissolution in instances of "gamesmanship in the negotiation of internal corporate disputes"); Smith-Shrader Co. v. Smith, 136 Ill. App. 3d 571, 582 (1985) (rejecting claim of shareholder who committed breach of fiduciary duty to company to force its dissolution); Lien v. Lien, 2004 S.D. 8, ¶¶ 10, 23 (rejecting claim of director who boycotted directors' election meeting and then claimed deadlock due to failure of corporation to elect directors).

A fourth factor in determining whether a deadlock exists is the degree and extent of distrust and antipathy between the directors. See, e.g., Shawe v. Elting, 157 A.3d 152, 158 (Del. 2017) (distrust between directors of corporation contributed to deadlock); Black, 266 Ga. at 155 ("hostile and static situation" constituted deadlock). Mutual antipathy can transform what may begin as a run of the mill disagreement into irreconcilable conflict and stalemate where hostility precludes compromise. See Misita v. Distillers Corp., 54 Cal. App. 2d 244, 250 (1942) (dispute between parties calcified into deadlock meriting dissolution as result of "ill-feeling, dissension, hatred, mutual hostility and distrust" between board members).

Given the undisputed evidence, the conclusion that the conflict between the parties constitutes a deadlock is inescapable. Applying the first factor, the acknowledged facts underscore corporate paralysis with respect to a number of key matters. The parties have profoundly different opinions regarding both Indus's daily operations and its future. They disagree on such basic matters as staffing needs, as well as dividend and tax distributions, and even more fundamentally, hold diametrically opposed views as to long-term corporate strategies and goals. The areas of disagreement between the parties appear to far outweigh the few areas of agreement. Over the past few years, the parties appear to have agreed only on the matter of employee raises and the need to hire a new salesperson. As the Xifaras incident demonstrates, their agreement on the latter issue was superficial at best. The parties are diametrically opposed on nearly every issue of importance concerning Indus's current operations and its future.

The second factor also argues in favor of deadlock. Since the parties each own fifty per cent of Indus, each has the ability to prevent the other from enacting any policy with which he disagrees, on any subject; their stalemate thereby effectively paralyzes Indus on all of the issues on which the two disagree. As to the third factor, we discern no indication in the judge's findings that either party engineered the dispute

in bad faith. Rather, the facts reflect a genuine disagreement between the parties concerning the most basic aspects of company policy.

Looking to the final factor, the parties do not contest the trial judge's finding that they operate based on a relationship of mutual distrust and antipathy. The judge was well warranted in concluding that Koshy "views all of Sachdev's actions as an attempt to freeze him out of the management of the company" and that "Sachdev questions all of Koshy's actions." The record is replete with personal insults, questioning of motives, and general acrimony between the parties. This mutual antipathy in a two-director corporation has prevented the parties from compromising and has inspired increasing levels of brinksmanship. Accordingly, we conclude that Koshy has met his burden to show that the parties are deadlocked within the meaning of § 14.30 (2) (i).

B. _Irreconcilability of the deadlock_. The second part of the test for "true deadlock" under § 14.30 (2) (i) requires that the "shareholders are unable to break the deadlock." The critical inquiry with respect to this part of the test is whether the shareholders are able to work around the deadlocked directors. See, e.g., Goldstein v. Studley, 452 S.W.2d 75, 80 (Mo. 1970) (shareholders unable to break deadlock where shares evenly divided and board contained four directors). If the

shareholders are able to do so, then there is no need for a court to dissolve the company in order to break the deadlock.

In making this determination, a reviewing court must decide whether there is a mechanism by which the deadlock can be broken. In closely held corporations, two of the more common such mechanisms are buy-sell agreements and agreements providing for methods of alternative dispute resolution such as third-party mediation of disputes. A buy-sell agreement is a contract or other legal mechanism that provides for "the mandatory or optional repurchase of a stockholder's shares by the corporation or by the other stockholders upon the occurrence of a certain event," such as a deadlock. See Stephenson v. Drever, 16 Cal. 4th 1167, 1173 (1997). See also Hoberman, Practical Considerations for Drafting and Utilizing Deadlock Solutions for Non-Corporate Business Entities, 2001 Colum. Bus. L. Rev. 231, 232 (2001) (Hoberman) ("Perhaps the most common deadlock solution . . . is the 'buy-sell agreement' . . ."). An agreement requiring alternative dispute resolution in instances of deadlock also may provide shareholders with a mechanism to break it. See Hoberman, supra at 233.

The record contains no indication that such a mechanism exists in this case. Sachdev points to section five of the articles as a potential means by which the deadlock could be

broken.[10]  That provision, however, requires the parties to agree upon an arbitrator who then will value the selling shareholder's stock.  We discern no indication in the record that the parties would agree upon such an arbitrator, particularly given their previously demonstrated inability to agree on the price for a buyout of each other's shares.  In light of this, Koshy has met his burden of establishing that the shareholders are unable to break the deadlock.

C.  Irreparable injury.  The final part of the "true deadlock" test requires that "irreparable injury to the corporation is threatened or being suffered."  Since the term "irreparable injury" is not defined in the statute, but has a long-standing meaning at common law, we assume that the Legislature intended to incorporate the common-law meaning.  See Commonwealth v. Wynton W., 459 Mass. 745, 747 (2011) ("Where the Legislature does not define a term, we presume that its intent is to incorporate the common-law definition of that term, 'unless the intent to alter it is clearly expressed'" [citation

---

[10] Under section five of the articles, a shareholder who desires to divest himself of his shares first must notify the directors of the price at which he is willing to sell and provide the name of an arbitrator.  Within thirty days, the directors either must accept the offer or notify the shareholder of the name of another arbitrator.  The two arbitrators then select a third; after this panel of arbitrators is constituted, it may ascertain the value of the stock.  Following the evaluation, the directors have thirty days in which to purchase the stock at the set price; if they do not, the shareholder may dispose of the stock as he sees fit.

omitted]).

At common law, an irreparable injury is a harm which cannot be vindicated by litigation on the merits. See Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 616 (1980) (irreparable injury occurs when party "suffer[s] a loss of rights that cannot be vindicated should it prevail after a full hearing on the merits"). An irreparable injury need not be financial in nature. See Mordka v. Mordka Enterprises, Inc., 143 Ariz. 298, 305 (Ct. App. 1984) (profitability not sole criterion in considering irreparable injury); comment to G. L. c. 156D, § 14.30, 25A Mass. Gen. Laws Ann. at 72 (irreparable injury standard "may be met in a corporation that is operating at a profit"). A corporation may suffer irreparable injury due to severe corporate dysfunction or a frustration of the company's purpose, or by placing the company's business in jeopardy. See Shawe, 157 A.3d at 159 (profitable company subject to irreparable harm due to "irretrievably dysfunctional" management structure); Fernandez v. Yates, 145 So. 3d 141, 146 (Fla. Dist. Ct. App. 2014) (deadlock preventing effective use of company's sole asset created irreparable injury); Black, 266 Ga. at 155 (inability of sole and equal shareholders to agree on management of business presented threat of irreparable injury). A court may also consider "harm to a corporation's reputation, goodwill, customer relationships, and employee morale" (citation omitted).

See Shawe, 157 A.3d at 161.

The plain meaning of the term "threatened" implicates an assessment of the substantial likelihood that irreparable harm will occur. See Webster's New Universal Unabridged Dictionary 1975 (2003) (defining "threaten" as "to be a menace or source of danger to"). In this respect, the term is analogous to the concept of "substantial risk" in our jurisprudence on preliminary injunctions. See Packaging Indus. Group, Inc., 380 Mass. at 617 (preliminary injunction requires showing of "substantial risk of irreparable harm").

In determining whether a corporation is "threatened" with irreparable injury, a court must look beyond its current, short-term status. While a presently declining revenue stream, the departure of employees, or the depletion of clients may signal a threat of irreparable injury, the present well-being of a corporation does not preclude such a threat. A deadlock that prevents corporate management from effectively addressing the vital functions of the corporation creates a threat of irreparable injury even if the company appears financially profitable. Accordingly, a court must examine the nature and impact of a deadlock to determine if the company can remain viable in the long term. If not, then the corporation is threatened with irreparable injury.

In the circumstances here, we conclude that the fundamental

nature of the deadlock between the parties threatens irreparable injury to Indus, because the parties' mutual antipathy renders them unable effectively to manage the company. Their impasse regarding nearly every major corporate decision has cast a cloud on Indus's future. The parties cannot agree on anything of substance and, as the Xifaras situation demonstrates, the palpably corrosive acrimony between them prevents them from functioning even in areas of theoretical agreement. Meanwhile, as their dysfunctional relationship continues to deteriorate, the parties repeatedly have resorted to costly litigation, in efforts to outmaneuver each other and gain the upper hand in steering the corporation. Resort to management by litigation is neither a viable means of corporate governance nor an adequate substitute for functional management and planning. On the record before us, the trajectory of Indus plainly points south and a threat of irreparable injury has been shown. We therefore conclude that the parties' dispute constitutes a "true deadlock" within the meaning of § 14.30 (2) (i).

D. Remedy. The corporate dissolution statute provides that a Superior Court judge "may dissolve a corporation" if the three-part test for "true deadlock" set forth in § 14.30 (2) (i) is met. Given that the statute authorizes the "extreme" remedy of dissolution, see comment to G. L. c. 156D, § 14.30, 25A Mass. Gen. Laws Ann. at 71-72, we conclude that it also authorizes

lesser remedies, such as a buyout or the sale of the company as an ongoing entity.  See Brodie v. Jordan, 447 Mass. 866, 873 n.7 (2006) ("In most of these States, statutes authorize the more drastic remedy of involuntary dissolution, and thus courts have understandably inferred the power to order the lesser remedy of a buyout"); Shawe, 157 A.3d at 160 (affirming Court of Chancery's decision to appoint custodian to hold public auction of company in light of director deadlock); Sauer v. Moffitt, 363 N.W.2d 269, 275 (Iowa Ct. App. 1984) (statute which provided for dissolution allowed for other equitable relief); 21 West, Inc. v. Meadowgreen Trails, Inc., 913 S.W.2d 858, 867 (Mo. Ct. App. 1995) ("Courts are not limited to the remedy of dissolution and may, in equity, consider appropriate alternative forms of relief, including ordering the corporation to pay the petitioning shareholders their proportionate share in money").

The appropriate remedy should be decided in the first instance by the trial judge, and we remand the matter for such a determination.

b.  Breach of fiduciary duties.  Koshy contends that Sachdev committed a breach his fiduciary duty to Koshy by refusing to consent to tax and dividend distributions in late 2011 and early 2012, and by making an unreasonably low offer for Koshy's shares in early 2012.

Shareholders in a close corporation owe fiduciary duties to

both their fellow shareholders and the corporation itself.  See Demoulas v. Demoulas Super Mkts., Inc., 424 Mass. 501, 528-529 (1997); Donahue, 367 Mass. at 593.  Like partners, they owe to one another a duty of "utmost good faith and loyalty."  Donahue, supra.  Accordingly, they may not "act out of avarice, expediency or self-interest" towards their fellow shareholders. Id.  If a shareholder is able to demonstrate a "legitimate business purpose" for a challenged action, however, he or she will not be liable "unless the wronged shareholder succeeds in showing that the proffered legitimate objective could have been achieved through a less harmful, reasonably practicable, alternative mode of action."  Zimmerman v. Bogoff, 402 Mass. 650, 657 (1988).

The trial judge concluded that Sachdev had a legitimate business purpose for the actions that Koshy challenged.  In his findings of fact, the judge credited Sachdev's reasons for declining to agree to tax and dividend distributions and rejected Koshy's assertion that those reasons were a pretext to freeze him out of the company.  The judge also found that Sachdev's buy-out offer was a "low-ball" offer, but that it was not advanced in bad faith.  We review the judge's factual determinations for clear error, but we review de novo his determination that Sachdev did not commit a breach of his fiduciary duties to Koshy.  See Merola, 423 Mass. at 464.

At trial, Sachdev testified that he had refused to agree to dividend distributions in 2012 because of his concern over the loss of revenue following the expiration of the STARS contract in 2011.  Sachdev also testified that he would not agree to a tax distribution because of the fiscal uncertainty caused by Koshy's unilateral $690,000 distribution to himself.  We discern no error in the trial judge's rulings of law that these actions did not constitute a breach of fiduciary duty, because Sachdev had a "legitimate business purpose" for his conduct.  See Zimmerman, 402 Mass. at 657.  Sachdev's objection to a dividend distribution on the eve of the expiration of one of Indus's chief contracts was not unreasonable, and Koshy does not suggest a plausible "alternative mode of action" given these circumstances.  See id.  The same holds true for Sachdev's reluctance to sign off on a tax distribution when nearly three-quarters million dollars of Indus's retained cash was in escrow.  There is no indication that Sachdev acted out of the "avarice, expediency or self-interest" that undergirds a breach of fiduciary duty in taking these actions.  See Donahue, 367 Mass. at 593.

With regard to Sachdev's "low-ball" offer, the judge found that it was not made in bad faith.  Absent an agreement establishing such obligations, a shareholder in a close corporation does not owe a fiduciary duty to a fellow

shareholder in purchasing the other's shares in the corporation. See Goode v. Ryan, 397 Mass. 85, 90-91 (1986) (no obligation for shareholders to purchase other shareholders' stock in corporation in absence of agreement to the contrary).  No such obligation is contained in Indus's articles of incorporation, nor do these circumstances suggest any compelling reason to extend to the present case the duty set out in Donahue. Accordingly, we conclude that Sachdev did not commit a breach of his fiduciary duties to Koshy.

c.  Contempt.  Koshy maintains also that the judge erred in dismissing his complaint for contempt.  In that complaint, Koshy asserted that Sachdev repeatedly had violated the terms of the preliminary injunction, both before and after the trial.

The "purpose of civil contempt proceedings is remedial." Demoulas, 424 Mass. at 571.  A complaint for contempt "is 'intended to achieve compliance with the court's orders for the benefit of the complainant.'"  Mahoney v. Mahoney, 65 Mass. App. Ct. 537, 540 (2006), quoting Furtado v. Furtado, 380 Mass. 137, 141 (1980).  We review the decision to dismiss the complaint for abuse of discretion.  See Massachusetts Comm'n Against Discrimination v. Wattendorf, 353 Mass. 315, 317 (1967).

The judge dismissed the complaint, determining that it "rehash[ed] many of the issues and arguments made during the trial of the underlying claims" in the case, and discerning "no

reason to revisit those matters by way of a trial on the complaint for contempt." While some of the claims indeed reiterated issues litigated at trial, several others asserted violations that took place between the end of the trial in October, 2013, and the expiration of the preliminary injunction, which remained in effect through the entry of judgment in August, 2015. Among these are assertions that, in January, 2014, Sachdev canceled checks that Koshy had written to a subcontractor; in March, 2014, Sachdev made a payment in excess of the limits in the injunction; in December, 2014, Sachdev executed a contract with a third-party vendor without Koshy's consent; during all of 2014, Sachdev refused to authorize a tax distribution; and, in February, 2015, Sachdev denied Koshy access to payroll.

While claims duplicative of a prior action are subject to dismissal as improper claim splitting, see Mass. R. Civ. P. 12 (b) (9), as amended, 450 Mass. 1403 (2008), this proscription extends only to claims which raise the same issues as did the prior action. See M.J. Flaherty Co. v. United States Fid. & Guar. Co., 61 Mass. App. Ct. 337, 339 (2004) ("Rule 12 [b] [9] provides for the dismissal of a second action in which the parties and the issues are the same as those in a prior action still pending in a court of this Commonwealth"). Given that the complaint for contempt asserted a number of

violations of the preliminary injunction that occurred after the trial, the judge should not have dismissed the complaint on the ground that it merely rehashed issues raised at trial.  On remand, the trial judge should consider separately those issues involving conduct after the end of trial but during the pendency of the proceedings.

3.  <u>Conclusion</u>.  The judgment is vacated and set aside. The matter is remanded to the Superior Court for entry of a judgment that the parties have reached a "true deadlock" within the meaning of G. L. c. 156D, § 14.30, and for further proceedings consistent with this opinion.

<u>So ordered</u>.